FILED
CLERK

December 12, 2022

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
NO LIMIT AUTO ENTERPRISES, INC.,

                  Plaintiff,

         -against-

NO LIMIT AUTO BODY, INC.,

                 Defendant.
-------------------------------------------------------------X

**REPORT AND
RECOMMENDATION**
21-cv-04755 (AMD) (JMW)

**A P P E A R A N C E S:**

David Joseph Mahoney, Esq.
Anthony C. Acampora, Esq.
**SilvermanAcampora LLP**
100 Jericho Quadrangle, Suite 300
Jericho, NY 11753
*Attorney for Plaintiff*

*No Appearance by Defendant*

**WICKS,** Magistrate Judge:

      Plaintiff No Limit Auto Enterprises, Inc. commenced this action against Defendant No Limit Auto Body, Inc. on August 23, 2021, asserting claims for (1) Breach of Contract, (2) Federal Trademark Infringement pursuant to 15 U.S.C. § 1114 *et. seq.*, (2) False Designation/Federal Unfair Competition and injunctive relief pursuant to 15 U.S.C. § 1125(a), and (3) Declaratory Judgment pursuant to 28 U.S.C. § 2201.  (DE 1.)  Before the Court is Plaintiff's motion for default judgment (DE 15) on referral to the undersigned from the Hon. Ann M. Donnelly for a Report and Recommendation.  (Electronic Order dated Aug. 12, 2022.)  For the reasons stated herein, the undersigned respectfully recommends granting Plaintiff's motion in part, and denying it in part.

## BACKGROUND

Plaintiff, a New York corporation, owns a trademark for the name "NO LIMIT AUTO BODY" ("Mark"), which is registered with the United States Patent and Trademark Office.  (*See* DE 1; DE 1-3.)  On or about August 2020, Plaintiff and Defendant, a California corporation, entered into a License and Consulting Agreement ("Agreement").  (*Id* at ¶¶ 6-7, 11; DE 1-2.) The Agreement was executed by Jose Cardona, President for Plaintiff, on behalf of Plaintiff, and by Arutyun Keshishyn, President for Defendant, on behalf of Defendant.  (DE 1.)  Plaintiff granted Defendant a "limited license to use Plaintiff's Mark, and certain other proprietary materials and systems."  (DE 15-9 at 3.)  This limited license allowed Defendant to operate a "No Limit" branded auto body collision repair shop in California.  (DE 1 at ¶ 16.)  As with most franchise agreements, this one required Defendant to conform to certain standards and practices. (*Id.* at ¶ 18.)  The Agreement also allowed Defendant to use Plaintiff's Licensed Materials, which are defined in the complaint as Plaintiff's "Confidential Information," "Intellectual Property," "Licensed Marks," "Marketing Materials," "Proprietary Marks," "Standards," a "Quality Insurance Program," "Software," and the "System," and are further defined in the Agreement.  (*see* DE 1 at ¶ 15.)

In exchange for these rights, Defendant was obligated to pay weekly fees to Plaintiff as well as a percentage of "receipts from the sale of certain auto body parts."  (DE 15-9 at 3; DE 1 at ¶ 2.)  Plaintiff asserts that Defendant failed to make weekly payments after October 2, 2020. (DE 1.)  On January 5, 2021, Plaintiff sent Defendant a notice of default advising Defendant that it had defaulted, that under the Agreement it had fourteen days to cure the default, and that the Agreement would be deemed terminated if the default was not cured.  (DE 1 at ¶¶ 23-25; DE 1-4.)  On January 28, 2021, after the allotted time to cure had passed, Plaintiff sent a termination

notice advising Defendant that it had failed to cure its default within fourteen days, and thus, the Agreement was terminated effective January 20, 2021.  (DE 1 at ¶ 26; *see* DE 1-5.)

The Agreement provided that upon termination Defendant was required to cease use of, return, or destroy and delete certain Licensed Materials.  (DE 1 at ¶ 19.)  Plaintiff states that following the termination of the Agreement, Defendant failed to cease use of Plaintiff's Marks and Licensed Materials and continued to profit from their use without compensating Plaintiff. (DE 1 at ¶ 27.)  Therefore, Plaintiff commenced this action.  (DE 1.)

Defendant was served on September 15, 2021 in California through service upon an authorized agent.  (DE 8.)  Defendant failed to answer or otherwise respond to the complaint and, on October 18, 2021, Plaintiff requested a Certificate of Default against Defendant.  (DE 9.) On October 21, 2021, the Clerk for the Eastern District of New York issued a Certificate of Default against Defendant.  (DE 11.)  On January 14, 2022, Plaintiff filed a motion for default judgment against Defendant (DE 13), which the Hon. Ann M. Donnelly referred to the undersigned.  (Electronic Order dated Jan. 18, 2022.)  The Court denied this motion with leave to renew upon properly submitting the motion in compliance with Local Civil Rule 55.2(b). (Electronic Order dated Aug. 9, 2022.)  Plaintiff once again moved for default judgment against Defendant.  (DE 15.)  On August 12, 2022, the Hon. Ann M. Donnelly referred the instant motion to the undersigned for a Report and Recommendation.  (Electronic Order dated Aug. 12, 2022.)

## LEGAL STANDARD UNDER RULE 55(b)

There is a two-step process for the granting of default judgments under Fed. R. Civ. P. 55.  First, the Clerk of the Court enters default when a party fails to plead or otherwise defend the action.  *See* Fed. R. Civ. P. 55(a); *see also* E.D.N.Y. Local R. 55.2.  After the clerk's

certificate of default is issued and posted on the docket, a party may apply for entry of a default judgment. Fed. R. Civ. P. 55(b); *see also* E.D.N.Y. Local R. 55.2(b). The decision to grant a motion for default is left to the discretion of the district court. *United States v. Dougherty*, No. 15-cv-554 (ADS) (AKT), 2016 WL 5112063, at *3 (E.D.N.Y. Aug. 1, 2016), *report and recommendation adopted*, 2016 WL 4705549 (E.D.N.Y. Sep. 7, 2016). A default constitutes an admission of all well-pleaded factual allegations in the complaint, except those relating to damages. *See Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992); *see also Joe Hand Promotions, Inc. v. El Norteno Rest. Corp.*, No. 06-cv-1878(RJD)(JMA), 2007 WL 2891016, at *2 (E.D.N.Y. Sept. 28, 2007) (finding that a default constitutes an admission of all well-pleaded factual allegations in the complaint and the allegations as they pertain to liability are deemed true).

However, a plaintiff must still demonstrate that the allegations set forth in the complaint state valid claims. *See City of N.Y. v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 137 (2d Cir. 2011) (suggesting that "a district court is 'required to determine whether the plaintiff's allegations establish the defendant's liability as a matter of law'" prior to entering default judgment (quoting *Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009) (alterations omitted)). The court must therefore ensure that (1) Plaintiff satisfied all the required procedural steps in moving for default judgment, *see* Local Civ. R. 55.2; and that (2) Plaintiff's allegations, when accepted as true, establish liability as a matter of law, *see Finkel*, 577 F.3d at 84.

## DISCUSSION

### A.  Procedural Compliance

Local Civil Rule 7.1 requires motions to include a notice of motion, a memorandum of law, and supporting affidavits or exhibits containing any necessary factual information for the decision of the motion.  E.D.N.Y. Local R. 7.1(a)(1) - (3).  Local Civil Rule 55.2 requires that a party moving for default judgment append to its application the Clerk's certificate of default, a copy of the claim to which no response has been made, a proposed form of default judgment, and that all papers submitted to the Court under Rule 55.2(b) be mailed to the party against whom a default is sought at the last known address of such party with proof of mailing filed with the Court.  E.D.N.Y. Local R. 55.2(b) - (c).

Initially, this Court denied Plaintiff's motion for default (DE 13) with leave to renew upon properly submitting the motion in compliance with Local Civil Rule 55.2(b), which requires a copy of the claim to which no response has been made, and a copy of the Clerk's certificate of default to be attached to the application for a judgment by default.  (Electronic Order dated Aug. 9, 2022.)  The Court, noting that these deficiencies were merely exemplars and not an exhaustive list, further cautioned Plaintiff to review the applicable rules pertaining to filing a motion for default judgment.  (*Id.*)  Plaintiff then filed the subject motion for default judgment (DE 15), which includes a proposed judgment (DE 15-5), a memorandum of law (DE 15-9), a declaration in support (DE 15-8), a copy of the complaint (DE 15-6), the certificate of default as to Defendant entered by the Court on October 21, 2021 (DE-15-7), and the affidavit of service confirming service of the motion for default on August 10, 2022, as to defendant via first class mail.  (DE 15-10.)

Accordingly, the Court finds that the instant motion complies with the procedural requirements of the Local Civil Rules.

**B. <u>Personal Jurisdiction</u>**

When considering a motion for default, a court "may first assure itself that it has personal jurisdiction over the defendant." *Mickalis Pawn Shop, LLC*, 645 F.3d at 133 (citation omitted). Since a judgment rendered against a defendant over whom the Court does not have personal jurisdiction can be vacated pursuant to Rule 60(b)(4), it "preserves judicial economy for the court to assess personal jurisdiction from the outset and thereby avoid rendering a void judgment." *Foshan Shunde Xinrunlian Textile Co. v. Asia 153 Ltd.*, No. 14-cv-4697 (DLI) (SMG), 2017 WL 696025, at *2 (E.D.N.Y. Jan. 30, 2017), *report and recommendation adopted*, Electronic Order (Mar. 21, 2017). Here, the Defendant has failed to appear in this action so "a *sua sponte* assessment of personal jurisdiction is appropriate." *Id*. (conducting a *sua sponte* personal jurisdiction analysis on a default motion).

For a court to exercise personal jurisdiction, (i) a plaintiff must complete proper service of process, (ii) there must be a statutory basis for personal jurisdiction that renders such service of process effective, and (iii) the exercise of personal jurisdiction must comport with constitutional due process principles. *See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673. F.3d 50, 60-61 (2d Cir. 2012).

As an initial matter, service was procedurally proper here. Rule 4(h) provides that a domestic or foreign corporation may be served by "delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process . . . ." *See* Fed. R. Civ. P. 4(h)(1)(B). Here, the affidavit of service filed to the docket demonstrates that service of the complaint was

properly effectuated by service through an authorized agent of Defendant in the state of California, which responded in the affirmative when asked if she was authorized to accept service on behalf of Defendant, (*see* DE 8). *See* Fed. R. Civ. P. 4(h)(1)(B).

"Personal jurisdiction in a diversity case is determined by the law of the state in which the district court sits." *SAS Grp., Inc. v. Worldwide Inventions, Inc.*, 245 F. Supp. 2d 543, 547 (S.D.N.Y. 2003) (citing *Kernan v. Kurz–Hastings, Inc.*, 175 F.3d 236, 240 (2d Cir.1999)). The same goes for a case arising under federal question jurisdiction unless the applicable federal statute contemplates nationwide service of process, which as relevant here, the Lanham Act does not. *See Sea Tow Servs. Int'l, Inc. v. Pontin*, 472 F. Supp. 2d 349, 358 (E.D.N.Y. 2007) (citing *Sunward Elec., Inc. v. McDonald*, 362 F.3d 17, 22 (2d Cir.2004)).  Thus, the Court first looks to New York law for the purpose of determining personal jurisdiction over Defendant in New York. Then, the Court evaluates whether the "exercise of jurisdiction under state law satisfies federal due process requirements of 'fair play and substantial justice.'" *Mortg. Funding Corp. v. Boyer Lake Pointe, LLC*, 379 F. Supp. 2d 282, 286 (E.D.N.Y. 2005) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)).  Under New York law there are two routes for a court to exercise of personal jurisdiction over an out-of-state defendant like here.  The Court considers each in turn below.

### i.    General Jurisdiction

First, under New York Civil Practice Law and Rules ("CPLR") 301, a "foreign corporation is subject to general personal jurisdiction in New York if it is doing business in the state." *Foshan Shunde Xinrunlian Textile Co.*, 2017 WL 696025, at *3 (internal quotation marks and citations omitted).  In essence, a foreign corporation -- one not incorporated in New York -- would be "subject to personal jurisdiction with respect to any cause of action, related or

unrelated to the New York contacts, if it does business in New York not occasionally or casually, but with a fair measure of permanence and continuity." *Id.*   The Court considers this issue in light of the Supreme Court's pronouncements in *Daimler* and *Goodyear*, where the Court stated that other than in the "exceptional case," the exercise of general jurisdiction is confined to a corporation's "place of incorporation and principal place of business." *See Aybar v. Aybar*, 37 N.Y.3d 274, 289, 177 N.E.3d 1257, 1265 (2021) (citing *Daimler AG v. Bauman*, 571 U.S. 117 (2014); *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915 (2011)).

Here, Defendant is a corporation incorporated, and with a place of business, in the state of California.  (DE 1 at ¶ 7.)  Plaintiff does not assert, nor does the Court find, that this would be an exceptional case where "a corporation's operations in a forum other than its formal place of incorporation or principal place of business may be so substantial and of such a nature as to render the corporation at home" in a state.  *Id.* (citations omitted).  Thus, the Court does not have general jurisdiction over Defendant.

### ii.    Specific Jurisdiction

Second, pursuant to New York's long-arm statute, CPLR 302(a), a court "may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent . . . transacts any business within the state," as long as the Plaintiff's "cause of action aris[es] from" that "transact[ion]."  CPLR 302(a).  This is known as specific jurisdiction and sometimes referred to as long-arm jurisdiction.  To exercise specific jurisdiction through New York's long-arm statute, "two requirements must be met: (1) The defendant must have transacted business within the state; and (2) the claim asserted must arise from that business activity."  *Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 103 (2d Cir. 2006) (citing *McGowan v. Smith,* 52 N.Y.2d 268, 273, 437 N.Y.S.2d 643, 419 N.E.2d 321 (1981)).

"To determine whether a party has 'transacted business' in New York, courts must look at the totality of circumstances concerning the party's interactions with, and activities within, the state." *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 105 (2d Cir. 2006).  Courts consider the following factors:

> (i) whether the defendant has an on-going contractual relationship with a New York corporation; (ii) whether the contract was negotiated or executed in New York and whether, after executing a contract with a New York business, the defendant has visited New York for the purpose of meeting with parties to the contract regarding the relationship; (iii) what the choice-of-law clause is in any such contract; and (iv) whether the contract requires franchisees to send notices and payments into the forum state or subjects them to supervision by the corporation in the forum state.

*Sunward, Inc.*, 362 F.3d 17 at 22 (quoting *Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.,* 98 F.3d 25, 29 (2d Cir.1996) (internal citations omitted)).

Considering the circumstances presented in the record here, Defendant has transacted business in New York within the reach of CPLR 302(a).  First, Defendant had an ongoing contractual relationship with, and made payment to, Plaintiff -- a New York corporation, (DE 1 at ¶ 21).  Second, though scant on details, Plaintiff does allege that Defendant "conducted business" within New York, (DE 1 at ¶ 10), and "negotiated with Plaintiff within this judicial jurisdiction with respect to the particular subject matter at issue in this action," (*see* DE 15-9 at 5).  *See Rescuecom Corp. v. Chumley*, 522 F. Supp. 2d 429, 441 (N.D.N.Y. 2007) (finding defendant's contacts sufficient where they got in contact with plaintiff by sending a communication to their New York headquarters, plaintiff forwarded the agreement to them from New York, and they attempted to renegotiate the agreement's terms with plaintiff's management, which were located in New York); *see also LG Cap. Funding, LLC v. M Line Holdings, Inc.*, 422 F. Supp. 3d 739, 753 (E.D.N.Y. 2018) ("Courts have found sufficient business contacts to

support personal jurisdiction under CPLR § 302(a)(1) in situations where non-domiciliaries have entered into contracts with New York-based companies.")

Third, the choice of law provision in the contract negotiated and agreed to by the parties unambiguously provides for New York law.  (*See* DE 1-2 at 34.)  And a choice of law provision is a "significant factor in a personal jurisdiction analysis because the parties, by so choosing, invoke the benefits and protections of New York law." *Sunward*, 362 F.3d at 23.  Fourth, the Agreement required all communications under it to be sent to Plaintiff's New York address, (*see* DE 1-2 at 34), and Defendant was subject to Plaintiff's control in many respects -- Defendant was required to comply with the systems and standards set by Plaintiff and receive its approval for a variety of things under the Agreement, (*see, e.g.*, DE 15-1 at 15.)  *See id.* (noting, *inter alia*, that under the agreement defendants were assisted and supervised by plaintiff, and payments and notices were required to be made to plaintiff, which was a New York corporation).

"Section 302(a) also requires that the claims asserted 'aris[e] from any of the acts' that provide the basis for exercising jurisdiction." *Sea Tow Servs. Int'l, Inc.*, 472 F. Supp. 2d at 360 (E.D.N.Y. 2007) (quoting CPLR 302(a)).  "[A] claim 'aris[es] from' a particular transaction when there is 'some articulable nexus between the business transacted and the cause of action sued upon.'" *Id.* (quoting *Sole Resort*, 450 F.3d at 103).  "A plaintiff must establish the court's jurisdiction with respect to each claim asserted." *Sunward*, 362 F.3d at 24; *see also Int'l Equity Investments, Inc. v. Opportunity Equity Partners, Ltd.*, 475 F. Supp. 2d 456, 460 (S.D.N.Y. 2007) (noting that "personal jurisdiction must be determined on a claim-by-claim basis").

The breach of contract, trademark and false designation, declaratory judgment, and injunctive relief claims are sufficiently related to the business transacted. *See id.* First, that Defendant's breach, namely their failure to pay, did not occur in New York, it is of no moment.

Since, *inter alia*, the Agreement was at least partially negotiated in New York, its choice of law provision provides for New York law, payments were to be made to Plaintiff, and all communications under the Agreement were to be mailed to Plaintiff's New York address, the breach of contract claim relates to these transactions. *See Sea Tow Servs. Int'l*, 472 F. Supp. 2d at 360 (finding contract claims to arise from breach of the agreement that was partially negotiated in New York, required payments to be made to the New York corporation, and included a choice of law provision.)

Plaintiff's trademark infringement and false designation claims are similarly related to the business transacted. *See id.* ("[A]lthough the alleged infringing conduct occurred in Florida, defendants had previously entered into and operated under a licensing agreement with a New York corporation, and the disputed validity of that agreement underlines plaintiff's trademark claims."). Plaintiff seeks "a declaration that Plaintiff is the rightful owner of the duly registered Trademarks included within the Licensed Materials, including but not limited to the trademark constituting U.S. Registration No. 6,041,868 registered April 28, 2020; that the Agreement has been terminated; and that any such license or permissible use of the Licensed Materials and trademarks conferred by such Agreement is no longer in force and effect." (DE 1 at 11.) The declaratory relief sought relates to the Agreement for similar reasons and is sufficiently related to the business transactions.

Plaintiff also seeks a "preliminary and permanent injunction restraining and enjoining Defendant, its agents, servants, and employees and all persons acting thereunder, in concert with, or on their behalf, from using, licensing, or selling the marks contained in part within the Licensed Materials." (DE 15 at 7.) *See Sunward*, 362 F.3d at 24 (finding that "Plaintiff's cause of action has a substantial relationship to such transactions, and the exercise of personal

jurisdiction is also constitutional" in part where Plaintiff sought a preliminary injunction restraining its former licensee's use of its trademark).

"The exercise of long arm jurisdiction over Defendants by a New York court must also satisfy constitutional due process standards." *Id.* To satisfy the requirements of due process, the defendant's activities in New York must constitute "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum States, thus invoking the benefits and the protection of its laws." *NW Direct Design & Mfg., Inc. v. Glob. Brand Mktg., Inc.,* No. 98-cv-4756 (LAP), 1999 WL 493348, at *3 (S.D.N.Y. July 12, 1999) (quoting *Burger King*, 471 U.S. at 475). This involves a two-fold inquiry: (1) "minimum contacts," and (2) "reasonableness." *Sea Tow Servs. Int'l*, 472 F. Supp. 2d at 360.

First, the Court is satisfied that Plaintiff's claims arise out of Defendant's contacts with New York and support specific jurisdiction because this lawsuit stems from those very business transactions. Namely, Defendant negotiated and entered into an Agreement with a New York corporation, subjected itself to that corporation's supervision and control, agreed to mail all communications to that corporation's New York headquarters, made payments to that corporation, and freely contracted to have the Agreement governed by New York law. *See id*. at 361 (concluding the same on similar grounds). It would be no surprise to Defendant if it were called to court in New York.

Second, the exercise of specific jurisdiction is reasonable. The factors supporting this conclusion include:

> (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies.

*Id.* (quoting *Asahi Metal Indus. Co., Ltd. v. Superior Ct. of Calif., Solano Cty.*, 480 U.S. 102, 113 (1987)).

New York undoubtedly has an interest in the claims being brought within the State because New York is Plaintiff's home base, and by the same virtue, Plaintiff has a strong interest in litigating this action in New York where "its incorporated and has its principal place of business." *See id.* The burden on Defendant, if any, to litigate here does not weigh strongly in its favor because "'the conveniences of modern communication and transportation ease what would have been a serious burden only a few decades ago.'" *Id.* (citation omitted). The Court finds the remaining factors to be neutral, and given Defendant's default, it has not been provided, nor does it find, any reason why exercise of specific jurisdiction would be unreasonable.

Accordingly, based upon the foregoing, the undersigned respectfully recommends a finding that there is a sufficient basis to exercise personal jurisdiction over Defendants as to Plaintiff's claims.

### C. <u>Liability</u>

Well-pleaded allegations in a complaint are presumed true when a defendant fails to present a defense to the court. *Antoine v. Brooklyn Maids 26, Inc.*, 489 F. Supp. 3d 68, 82 (E.D.N.Y. 2020). However, "a plaintiff still must demonstrate that the factual allegations set forth in [the] complaint state valid claims to relief." *Id.* (citing *United States v. Meyers*, 236 F. Supp. 3d 702, 708 (E.D.N.Y. 2017)).

i.      **Liability for Breach of Contract**

"A federal court sitting in New York must apply New York's choice of law rules when its jurisdiction is based on diversity." *Merch. Cash & Cap., LLC v. Haute Soc'y Fashion, Inc.*, No. 16-CV-2696 (ILG), 2017 WL 2912452, at *2 (E.D.N.Y. July 6, 2017) (quoting *Med. Research Assocs., P.C. v. Medcon Fin. Servs.*, 253 F. Supp. 2d 643, 647 (S.D.N.Y. 2003)).  "New York law is clear in cases involving a contract with an express choice-of-law provision: Absent fraud or a violation of public policy, a court is to apply the law selected in the contract as long as the state selected has sufficient contacts with the transaction." *Id.* (quoting *Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 556 (2d Cir. 2000).  The parties' Agreement includes a choice of law provision, which instructs that the Agreement is to be "construed under and governed exclusively by the laws of New York."  (DE 1-2.)  Thus, New York law governs Plaintiff's breach of contract claim.

Taking the well-pleaded facts in the complaint as true, and having reviewed the Agreement, the Court finds that Plaintiff has adequately pled a claim for breach of contract. The elements of breach of contract in New York are: "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Martino v. MarineMax Ne., LLC*, No. 17-CV-4708 (DRH) (AKT), 2018 WL 6199557, at *3 (E.D.N.Y. Nov. 28, 2018) (quoting *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)).

Defendant entered into the Agreement with Plaintiff whereby, *inter alia*, Defendant would pay an agreed-upon weekly payment of $1,500 and a percentage of its sales on certain auto body parts to Plaintiff, (DE 1 at ¶ 2) in exchange for a limited license to use Plaintiff's Mark and Licensed Materials in the operation of Defendant's auto body business.  (*Id.*)  Defendant used and continues to use Plaintiff's Mark and Licensed Materials.  (*Id.* at ¶ 4.)  Defendant

14

stopped making the required weekly payments as of October 2, 2020.  (*Id.* at ¶¶ 21-22; DE 15-1 at 8.)  And Defendant subsequently failed to cure within fourteen days after Plaintiff notified Defendant of its default as required under the Agreement.  (DE 1 at ¶¶ 12-13, 23-25; DE 15-2 at 27.)

Accordingly, the undersigned respectfully recommends that the Court grant Plaintiff's request for default judgment for Count I.

### ii.    Liability for Infringement and False Designation Under the Lanham Act

A defaulting defendant is liable for trademark infringement if it is established by plaintiff that defendant's "use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." *Lighting & Supplies, Inc. v. New Sunshine Energy Sols. Inc.*, No. 20-cv-2790 (FB) (VMS), 2022 WL 771397, at *4 (E.D.N.Y. Feb. 10, 2022), *report and recommendation adopted*, 2022 WL 768302 (E.D.N.Y. Mar. 14, 2022) (quoting 15 U.S.C. § 1114(1)(a)).  A defendant is liable for false designation of origin for "'use[ ] in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person.'" *Lighting & Supplies*, 2022 WL 771397, at *4 (quoting 15 U.S.C. § 1114(1)(a))).  The court considers the trademark and false designation claim together because the claims are "governed by the same

legal standard." *Am. Auto. Ass'n, Inc. v. Limage*, No. 15-cv-7386 (NGG) (MDG), 2016 WL 4508337, at *2 (E.D.N.Y. Aug. 26, 2016).

To succeed on these claims, "[t]he plaintiff[] must show that they own a valid trademark, that the defendant[] used the trademark in commerce, and that their use of that mark is likely to cause confusion regarding the source of the relevant product or services." *Mitchell Grp. USA LLC v. Udeh*, No. 14-cv-5745 (DLI) (JO), 2017 WL 9487193, at *3 (E.D.N.Y. Mar. 8, 2017), *report and recommendation adopted*, No. 14-cv-5745 (AMD), 2017 WL 3208532 (E.D.N.Y. July 28, 2017). "[P]roperly filed registration under 15 U.S.C. § 1065 is deemed conclusive evidence of the validity of a registered trademark 'relat[ing] to the exclusive right to use the mark on or in connection with the goods or services specified . . . .'" *Cap. One Fin. Corp. v. Cap. One Certified Inc.*, No. 18-cv-580 (ARR) (RML), 2019 WL 1299266, at *2 (E.D.N.Y. Mar. 5, 2019), *report and recommendation adopted*, 2019 WL 1299661 (E.D.N.Y. Mar. 21, 2019) (quoting 15 U.S.C. § 1115(b)). First, Plaintiff has a valid trademark by virtue of its registration. Plaintiff's evidence (*see* DE 1-3) from the U.S. Patent and Trademark Office's online database shows a registered trademark for "NO LIMIT AUTO BODY." *See id.* Second, Defendant has continued to use Plaintiff's Mark without authorization. (DE 1 at ¶ 4.)

Third, an application of the relevant factors, on balance, shows that Defendant's use of the Mark is likely to cause confusion as to the source of the service. Courts use the following factors when determining the likelihood of confusion:

> (1) [the] strength of the plaintiff's mark; (2) the degree of similarity between the two marks; (3) the proximity of the products in the marketplace; (4) the likelihood that the plaintiff will bridge the gap between the products (enter a market related to that in which the defendant sells its product); (5) evidence of actual confusion; (6) the defendant's bad faith; (7) quality of the defendant's product; and (8) sophistication of the relevant consumer group.

*Lighting & Supplies*, 2022 WL 771397, at \*4 (citing *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961)).  No one factor is outcome determinative, and the factors should be considered under the totality of the circumstances.  *Id.* at \*4.

First, the plaintiff's mark is "presumed to be strong by virtue of being registered."  *See Century 21 Real Estate LLC v. Bercosa Corp.,* 666 F.Supp.2d 274, 282 (E.D.N.Y. 2009) (citing *Rolex Watch U.S.A., Inc. v. Jones,* 2000 WL 1528263, at \*2 (S.D.N.Y. Oct.13, 2000)). Plaintiff has spent ten years operating its business such that its Mark is associated with its well-established auto service, repair, and supply brand.  (DE 15-9 at 3.)

Second, as to the degree of similarity between the Marks, Plaintiff's registered Mark is "NO LIMIT AUTO BODY," and Defendant is operating under that same exact name.  (DE 15-2.)  Defendant was granted a limited license to actually use Plaintiff's Mark and certain other materials.  (DE 1 at ¶ 1; DE 15-9 at 9.)  Thus, the Marks are identical.

As to the third and fourth factors, the parties offer the same service and Defendant continues to operate out of the same location.  *See Century 21 Real Est. LLC*, 666 F. Supp. 2d at 282 ("The marketplace factors also favor Century 21: the parties offer the same basic product (real estate brokerage services) and Bercosa continues to operate out of the same location it occupied as a Century 21 franchisee.").

As to the fifth and sixth prongs, Plaintiff and Defendant provide the same services under the same Marks, which "easily supports the inference that consumer confusion will result."  *See Lighting & Supplies*, 2022 WL 771397, at \*5.  Defendant used this Mark to open a body shop under Plaintiff's name and branding, and continues to use the Mark to profit from it without a license, and without payment to Plaintiff.  (DE 1 at ¶¶ 1-2.)  Therefore, Defendant is acting in

bad faith. *See id.* ("Defaulting Defendants demonstrated bad faith by continuing to engage in infringing conduct after receiving a demand to stop engaging in such conduct.")

Seventh, Plaintiff states that it is "a well-respected brand whose registered Mark identifies auto body shops doing business pursuant to and with the accrued recognition, notoriety, and commercial goodwill engendered by Plaintiff's hard work and years already spent, developing an existing brand and reputation in the auto services industry." (DE 15-9 at 1.) Thus, the quality factor also favors Plaintiff because it currently has no control over the quality of service that Defendant is providing under the guise of its brand. *See id.* at *6. And, finally, given the identical nature of the Mark used by Defendant, there is no reason to believe that the average consumer would not think that they were conducting business with Plaintiff. (DE 15-9 at 10.)

On balance, the likelihood of confusion factors favor a finding of liability for Federal Trademark Infringement under 15 U.S.C. § 1114 *et. seq*. and False Designation of Origin[1] under 15 U.S.C. § 1125(a) against Defendant. *See Lighting & Supplies*, 2022 WL 771397, at *5. Accordingly, the undersigned respectfully recommends that the Court grant Plaintiff's request for default judgment as to liability for Counts II and III.

---

[1] The complaint describes Count III as "False Designation/Federal Unfair Competition – 15 U.S.C. § 1125(a)" but Plaintiff's motion simply refers to the "false designation under the Lanham Act" claim. (DE 1 at ¶ 8; 15-9 at 6.) Nonetheless, the Court notes that "there is no specific Federal cause of action for unfair competition. Instead unfair competition under the Lanham Act is a category of claims consisting primarily of causes of action for false designation of origin and false advertising." *Lighting & Supplies, Inc.*, 2022 WL 771397, at *5 (citations omitted). And Plaintiff makes no attempt to plead, argue or seek default judgment specifically for an unfair competition claim that is separate from its false designation of origin claim.

**D.  Declaratory and Injunctive Relief**

   **i.        Declaratory Relief**

In its complaint, Plaintiff seeks, pursuant to 28 U.S.C. § 2201, "a declaration that Plaintiff is the rightful owner of the duly registered Trademarks included within the Licensed Materials, including but not limited to the trademark constituting U.S. Registration No. 6,041,868 registered April 28, 2020; that the Agreement has been terminated; and that any such license or permissible use of the Licensed Materials and trademarks conferred by such Agreement is no longer in force and effect." (DE 1 at 11.)  In a summary fashion in its motion for default judgment, Plaintiff states its well-pleaded allegations are sufficient to support default judgement for a "declaratory judgment as to the pleaded validity, [] of [its] Mark . . . ." (DE 15-9 at 6.)  But Plaintiff makes no distinct legal arguments in favor of declaratory judgment.

In any event, the Declaratory Judgment Act "by its express terms vests a district court with discretion to exercise jurisdiction over a declaratory action: 'In a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.'" *Alcon Vision, LLC v. Lens.com, Inc.*, No. 1:18-CV-00407 (NG) (RLM), 2022 WL 1665453, at *8 (E.D.N.Y. May 25, 2022) (citing *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 389 (2d Cir. 2005) (quoting 28 U.S.C. § 2201(a)).  "In order to decide whether to entertain an action for declaratory judgment, [the Second Circuit has] instructed district courts to ask: (1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty." *Id*. (citing *Duane Reade, Inc.*, 411 F.3d at 389).

Here, Plaintiff seeks a declaration that would be duplicative of its other claims, which provide adequate remedies, and are being decided under the same laws. The process of entering default judgment as to liability for each of Plaintiff's claims, naturally determines the rights of the parties. Thus, a declaration would not "serve a useful purpose." *Cf. Alcon Vision*, 2022 WL 1665453, at *8 (rejecting defendant's request for a declaratory judgment of trademark non-infringement under the Lanham Act because it mirrors plaintiff's claims for trademark infringement under the same statute). Plaintiff's request for a declaratory judgement does not seek any relief that is not already available under its other claims. Thus, the undersigned respectfully recommends denying Plaintiff's request for default judgment as to Count IV.

### ii.   Injunctive Relief

Plaintiff seeks an order permanently enjoining "Defendant from continued use of the trade dress and livery represented by the Mark, and from any further marketing or promotion of their business through and with the use of Plaintiff's trade dress and livery represented by the Mark." (DE 15-9 at 2.) "A court may issue an injunction on a motion for default judgment provided that the moving party shows that (1) it is entitled to injunctive relief under the applicable statute, and (2) it meets the prerequisites for the issuance of an injunction." *CommScope, Inc. of N. Carolina v. Commscope (U.S.A.) Int'l Grp. Co.*, 809 F. Supp. 2d 33, 41 (N.D.N.Y. 2011) (quoting *Pitbull Prods., Inc. v. Univ. Netmedia, Inc.,* No. 07-cv-1784, 2007 WL 3287368, at *5 (S.D.N.Y. Nov. 7, 2007)).

The first prong is met because "the Lanham Act vests the court with the "power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant . . . ." *See Rolls-Royce PLC v. Rolls-Royce USA, Inc.*, 688 F. Supp. 2d 150, 159 (E.D.N.Y. 2010) (quoting 15 U.S.C. § 1116);

*see also Century 21 Real Est. LLC*, 666 F. Supp. 2d at 295 ("'[A]ccording to the principles of equity and upon such terms as the court may deem reasonable to prevent the violation of . . . [the Act.]'" (quoting 15 U.S.C. § 1116)).

As to the second prong, "[a]n injunction is warranted where a party has succeeded on the merits, there is an absence of an adequate remedy at law, and an injunction is necessary to prevent irreparable harm." *Id.* (citing *Roach v. Morse,* 440 F.3d 53, 56 (2d Cir.2006)). There is actual success on the merits for Plaintiff's claims. *See Rolls-Royce PLC*, 688 F. Supp. 2d 150, 159 (E.D.N.Y. 2010) ("Actual success on the merits is shown by virtue of the defendant's default."). Irreparable harm is established in trademark cases where "there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods or services in question. *Century 21 Real Est. LLC*, 666 F. Supp. 2d at 295 (quoting *Lobo Enters., Inc. v. Tunnel, Inc.,* 822 F.2d 331, 333 (2d Cir.1987)).

Here, Plaintiff seeks a "preliminary and permanent injunction restraining and enjoining Defendant, its agents, servants, and employees and all persons acting thereunder, in concert with, or on their behalf, from using, licensing, or selling the marks contained in part within the Licensed Materials." (DE 15 at 7.) Irreparable injury is likely because the Defendant continues to use and infringe Plaintiff's Mark and the use will likely mislead customers as to the source of the services. *See Century 21 Real Est. LLC,* 666 F. Supp. 2d at 295 ("The record establishes that, absent an injunction, the defendants will continue to infringe the Century 21 Marks, and that such use is likely to mislead consumers as to the source of Bercosa's real estate brokerage services."); *see also Sunward Elecs.*, 362 F.3d at 25 (finding where "in the licensing context unlawful use and consumer confusion have been demonstrated, a finding of irreparable harm is automatic").

Finally, "in cases where confusion about the origin of goods or services leads to damage to reputation or loss of a potential relationship with a client that 'would produce an indeterminate amount of business in years to come[,]' monetary damages are difficult to establish and are unlikely to present an adequate remedy at law." *Century 21 Real Est. LLC*, 666 F. Supp. 2d at 296 (citing *Register.com, Inc. v. Verio, Inc.,* 356 F.3d 393, 404 (2d Cir.2004)). This is such a case. Here, the continued use of Plaintiff's Mark may negatively affect Plaintiff's brand and its reputation in ways that are impossible to quantify in terms of monetary compensation. *See id*. (finding that allowing defendants to "continue to use" of the marks "may adversely affect" the former licensor's "reputation and business in ways that may be difficult to quantify and that will not lend themselves easily to monetary compensation."). And the monetary damages the Court recommends, as discussed *infra*, are insufficient alone to prevent irreparable harm absent an injunction. *See Est. of Ellington ex rel. Ellington v. Harbrew Imports Ltd.*, 812 F. Supp. 2d 186, 196 (E.D.N.Y. 2011) (finding an award of monetary damages by itself would not fully compensate plaintiff because without an injunction the defendant's continued use of plaintiff's mark may adversely affect "Plaintiff's business dealings and future negotiations in a ways that may be difficult to quantify.").

Additionally, Courts also consider the balance of hardships between the parties to see if a remedy in equity is warranted, and that the public interest "would not be disserved by a permanent injunction." *See Est. of Ellington*, 812 F. Supp. 2d at 196. Here, if Defendant continues to use the Marks, Plaintiff will have to "expend further resources to stop infringement" and any resulting harm to Defendant from this injunction would not "outweigh the irreparable harm and damage to Plaintiff" if the misuse of Plaintiff's Mark is allowed to continue, (*see* DE 15-9 at 12 n.6). *See id*. Defendant would be able to continue offering auto body services if

enjoined but would not be able to use Plaintiff's Marks or Licensed Materials.  *See id*. at 196-97.

And the public interest would benefit from being protected from Defendant's continued

deception.  *See id*.  Accordingly, the undersigned respectfully recommends that a permanent

injunction as requested by Plaintiff with respect to its Marks and Licensed Materials is

appropriate, and thus, default judgment be entered as to Count II.

### E.  Damages under the Agreement

Once liability for default is established, the next inquiry is damages.  A party's default

constitutes a concession of all well pleaded allegations, however, such default "is not considered

an admission of damages."  *Double Green Produce, Inc. v. F. Supermarket Inc*., 387 F. Supp. 3d

260, 271 (E.D.N.Y. 2019) (quoting *Cement & Concrete Workers Dist. Council Welfare Fund,*

*Annuity Fund, Educ. & Training Fund & Other Funds v. Metro Found. Contractors Inc.*, 699

F.3d 230, 234 (2d Cir. 2012)).  Regardless of "the absence of opposition" due to the default of

defendant, "the court cannot simply accept a statement of the plaintiff concerning the amount of

damages, but rather must be provided with evidentiary proof that establishes the amount of

damages."  *Century 21 Real Est. LLC v. Team Mates Realty Corp.*, No. 07-cv-4134 (NG) (VVP),

2009 WL 910655, at *5 (E.D.N.Y. Feb. 18, 2009), *report and recommendation adopted*, 2009

WL 890561 (E.D.N.Y. Mar. 31, 2009).

Although "court[s] must ensure that there is a basis for the damages specified in a default

judgment, [they] may, but need not, make the determination through a hearing."  *Fustok v.*

*Conticommodity Servs., Inc.*, 122 F.R.D. 151, 156 (S.D.N.Y. 1998), *aff'd*, 873 F.2d 38 (2d Cir.

1989).  Here Plaintiff seeks: (1) $19,500 in compensatory damages, (2) $350,000 in liquidated

damages, (3) $12,467.50 in attorney's fees and costs, and (4) $181.77 per diem interest from

January 28, 2021, until entry of judgment.  (DE 15-9 at 19.)

i.      **Compensatory Damages under the Agreement**

Plaintiff states that they are owed $19,500 based on the thirteen weeks of missed payments.  (*See* DE 16 at 1-2.)  The Agreement states that $1,500 are due to Plaintiff each week "from the opening of the Collision Repair Shop for business" until the termination of the Agreement.  (DE 15-1 at 7.)  The Agreement was terminated January 20, 2021, as evidenced by the Notice of Termination sent on January 28, 2021.  (DE 15-3.)  Plaintiff states that it arrived at the thirteen-week number by calculating the weeks between the Agreement "taking effect" and termination of the Agreement, and then subtracting the single payment made by Defendant.  (DE 15-9 at 2.)  The Notice of Default states that Defendant failed to make weekly payments as of October 9, 2020.  (DE 15-2.)  There are fourteen weeks between October 9, 2020, and January 28, 2021, and Plaintiff was owed $1,500 per week and was only paid for one week.  Thus, Plaintiff is owed $19,500.

ii.     **Liquidated Damages under the Agreement**

For Defendant's failure to make payments under the Agreement, Plaintiff seeks to enforce a liquidated damages provision in the amount of $350,000.  "Liquidated damages constitute the compensation which, the parties have agreed, should be paid in order to satisfy any loss or injury flowing from a breach of their contract."  *Truck Rent-A-Ctr., Inc. v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 423–25, 393 N.Y.S.2d 365, 368-69, 361 N.E.2d 1015, 1017-18.  "In effect, a liquidated damage provision is an estimate, made by the parties at the time they enter into their agreement, of the extent of the injury that would be sustained as a result of breach of the agreement."  *Id*.  Though parties are free to agree to such clauses, a liquidated damages clause that departs from the "public policy [that] is firmly set against the imposition of penalties or forfeitures" will not be enforced.

*Id*. To determine whether the clause is a penalty the courts looks to whether "the amount liquidated bears a reasonable proportion to the probable loss and the amount of actual loss is incapable or difficult of precise estimation." *Id.*; *see also LG Cap. Funding*, 422 F. Supp. 3d at 747 (same).

The Court should assess the appropriateness of liquidated damages regardless of whether "the party against whom those damages are to be assessed is in default." *LG Cap. Funding, LLC*, 422 F. Supp. 3d at 746. But the Court is mindful that "[t]he burden is firmly on the party challenging the provision to provide [] justification by demonstrating that the stipulated damages are, in fact, an unconscionable penalty." *See L & L Wings, Inc. v. Marco-Destin Inc.*, 756 F. Supp. 2d 359, 364-365 (S.D.N.Y. 2010) (citation omitted) (applying New York Law).

Section 18.2(a) essentially states that Plaintiff's rights, if the Agreement is terminated, include payment of $350,000. (DE 15-1 at 30.) Plaintiff argues that the Defendant has admitted, through its breach, that its continued use of the Mark was likely to cause consumer confusion, and Plaintiff has been deprived of control of their Mark -- causing irreparable harm. (DE 15-9 at 15.) The Agreement recites the following ways in which the parties jointly contemplated that Plaintiff would be damaged by a breach:

> (i) loss of future Franchise or License Fees and fees used to market the System; (ii) loss of System representation in the area served by the Collision Body Shop; (iii) confusion of customers; (iv) injury to the goodwill in the Proprietary marks; and (v) lost opportunities to operate, license or franchise auto body repair shops in the area served by the Collision Body Shop. Licensee acknowledges that it will be difficult to estimate the revenues of the Collision Body Shop over a period of years, and that elements of Licensor's damages not directly calculated from the Collision Body Shop's revenues also will be difficult to calculate, and that such damages are real and meaningful to Licensor, and the proofs thereof would be burdensome and costly. Licensor and Licensee agree that liquidated damages (also deemed a Termination Fee) in the sum of three hundred and fifty thousand ($350,000.00) dollars (as set forth in Section 18.1(b) above) are not a penalty and represent a

25

reasonable estimate of just and fair compensation of Licensor for the damages that it would suffer. If this Agreement is terminated, Licensee must promptly pay to Licensor, in addition to any amounts otherwise payable to Licensor, liquidated damages (also deemed a termination fee) in said amount of three hundred and fifty thousand ($350,000.00) dollars as set forth herein and in Section 18.1(b) above. In addition to such damages, Licensor will have the right to recover reasonable attorneys' fees and court costs incurred in collecting such sums, plus Interest on all amounts due pursuant to this Section 18.2(a) from the date of such termination until paid.

(DE 15-1 at 30.)

"Liquidated damages clauses are suited to factual situations where there is uncertainty concerning the measure of damages." *L & L Wings, Inc.*, 756 F. Supp. 2d at 364 (citation omitted). "[I]t is that loss of control which is the very thing that constitutes irreparable harm in the licensing context." *Id.* (citation omitted). Attempting to precisely estimate the loss caused by the potential harm to Plaintiff's reputation and good will, is a hazy task. *Id.* Putting that harm aside, there are damages that could not be cleanly ascertained at the time of contract. Take for instance the monthly fees owed to Plaintiff for, *inter alia*, certain auto body repair parts sold by Defendant. At the time of contract, these fees were tied to an unknown amount -- Defendant's future business revenues. (DE 15-1 at 8.)

The parties agreed to this liquidated damages provision after jointly noting the difficulties of ascertaining damages caused by the breach. *See Microban Prod. Co. v. API Indus., Inc.*, No. 14-civ-41 (KPF), 2014 WL 1856471, at *19 (S.D.N.Y. May 8, 2014) (same). The Court finds that "where the damages result from the continued use of a trademark after the expiration of a license," as is the case here, this is the exact type of factual situation where a liquidated damages clause would be appropriate due to the uncertainty of estimating damages. *L & L Wings, Inc.*, 756 F. Supp. 2d at 364.

26

Plaintiff also argues that $350,000 is a reasonable amount that is not grossly disproportionate to the probable loss attributable to a breach. *See Truck Rent-A-Ctr., Inc.*, 41 N.Y.2d at 425, 393 N.Y.S.2d at 369, 361 N.E.2d at 1019 (noting the penalty inquiry also looks to whether "the amount liquidated bears a reasonable proportion to the probable loss"). Reasonableness is assessed based on when the agreement was executed, not when it was breached. *Id.* "Today the trend favors freedom of contract through the enforcement of stipulated damage provisions as long as they do not clearly disregard the principle of compensation." *JMD Holding Corp. v. Cong. Fin. Corp.*, 4 N.Y.3d 373, 380-81, 828 N.E.2d 604 (2005) (citing 3 Farnsworth, Contracts § 12.18, at 303-304 (3d ed.)).

The Agreement was to expire in fifty years. (DE 15-1 at 9.) Plaintiff was entitled to certain monthly royalties tied to Defendant's business revenue. (DE 15-1 at 8.) Plaintiff states that the liquidated damages amount assumes, instead of having to set forth proof of Defendant's future business revenue, that Plaintiff would have been entitled to a minimum of at least $7,000 in royalties per year (which multiplied by fifty years equals the subject amount). (DE 15-9 at 15-16.) The parties contemplated other losses that are difficult to quantify such as confusion of customers, and injury to the reputation and good will of Plaintiff's business. (DE 15-1 at 29-30.) Additionally, Plaintiff notes that it was entitled to a weekly fee of $1,500, which spread across the remaining lifespan of the contract (fifty years), would have exceeded $3,000,000 in profits. (DE 15-9 at 16.)

Further, the Court notes that it cannot determine Plaintiff's actual damages associated with lost royalties to date because Defendant has defaulted, and thus, without

access to the metrics to which those royalties are tied, determining actual damages for royalties alone would be guesswork.

Moreover, Courts give "due consideration to 'whether the parties were sophisticated and represented by counsel, the contract was negotiated at arms-length between parties of equal bargaining power, and . . . that [the provision] was freely contracted to." *See L & L Wings,* 756 F. Supp. 2d at 364 (citation omitted).  Here, Plaintiff avers that the parties engaged in arm's length negotiation in dispensing with the obligation to prove the amount of damages caused by the loss of control of the Mark and licensed materials.  (DE 15-9 at 16.)  *See L & L Wings, Inc.*, 756 F. Supp. 2d at 364 ("Nothing about the parties' respective bargaining positions or the circumstances surrounding the negotiation of the agreement indicates that the liquidated damages clause was anything other than the product of an arms' length negotiation rather than 'a situation fraught with possible overreaching.'").

Finally, since Defendant has not appeared to "argue or present evidence to the contrary, [it] ha[s] not met [its] burden of proving that the provision constitutes a penalty." *See World Gold Tr. Servs., LLC v. GoldCoin Devs. Grp. LP*, No. 20-CV-4667 (JGK), 2021 WL 4134681, at *4 (S.D.N.Y. Sept. 10, 2021) (noting that the defaulting defendants had not met their burden of proving the liquidated damages provision was a penalty).

Thus, Plaintiff has met its burden of showing that it is entitled to the amount the parties agreed to as liquidated damages and the undersigned respectfully recommends an award of liquidated damages accordingly.[2]

### iii.    Interest under the Agreement

Section 18.2(a) of the Agreement provides for recovery of interest "on all amounts due" related to enforcement of Plaintiff's post-termination rights "from the date of such termination until paid." (DE 15-1 at 30.)  It also provides for interest at the rate of 18% per annum, which is 1.5% simple interest per month.  (DE 15-2 at 4; DE 15 at 3.)  A prevailing plaintiff can recover "prejudgment interest on any sum awarded for breach of contract, "computed from the earliest ascertainable date the cause of action existed[.]"  *See LG Cap. Funding*, 422 F. Supp. 3d at 756 (citation omitted).  "Where the parties stipulate to an interest rate, 'prejudgment interest is calculated at the contract rate, until the amount owed under the contract merges into a judgment.'"  *Id.* (citation omitted).  Plaintiff calculated the interest using January 28, 2021, the date they sent their notice of termination, as the starting point and August 10, 2022, the date Plaintiff made their motion as the end point.  (DE 15 at 3.)  A total of 559 days have elapsed between January 28, 2021 to August 10, 2022.  (DE 15-9 at 19 n.9.)  The declaration of Attorney David J. Mahoney states that the total interest on the thirteen weekly payments and liquidated damages taken together ($350,000 + $19,500 = $369,500) as of August 10, 2022 is $101, 612.50, continuing to accrue at the rate of $181.77 per day until the entry of judgment.  However, a calculation of $181.77 multiplied by 559 days leads to a total of $101,609.43 in interest.  Accordingly, the Court respectfully recommends an award of $101,609.43 in interest up to

---

[2] Plaintiff notes that is not seeking statutory damages under the Lanham Act for Defendant's profits from the continued use of the Plaintiff's trademark, in favor of enforcing this liquidated damages provision. (DE 15-9 at 3 n.2.)

August 10, 2022, and interest continuing to accrue at the rate of $181.77 per day until the entry of judgment.

### iv.    Attorneys' Fees under the Agreement

Plaintiff seeks attorneys' fees in the amount of $12,467.50.  (DE 15-9 at 16.)  Such fees are contemplated in Section 18.2(a) of the Agreement where "[i]n addition to such damages, Licensor will have the right to recover reasonable attorneys' fees and court costs incurred in collecting such sums."  (DE 15-1 at 30.)  Thus, an award of reasonable attorneys' fees and costs is appropriate here.  *See Century 21 Real Est. LLC*, 2009 WL 910655, at *6-7 (E.D.N.Y. Feb. 18, 2009) (noting that an award of attorneys' fees and costs is appropriate where the franchise agreement gave plaintiff right to recover such fees).

This Court "enjoys broad discretion in determining the amount of a fee award."  *Vincent v. Comm'r of Soc. Sec.*, 651 F.3d 299, 307 (2d Cir. 2011).  The lodestar calculation, which is "the product of a reasonable hourly rate and the reasonable number of hours required by the case," "creates a 'presumptively reasonable fee.'  *Millea v. Metro-N. R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011).  "A party seeking an award of attorney's fees bears the burden to document 'the hours reasonably spent by counsel, and thus must support its request by providing contemporaneous time records reflected, for each attorney and legal assistant, the date, the hours expended, and the nature of the work done.'"  *Bds. Trs. Ins., Annuity, Scholarship, & Apprenticeship Training Funds Sheetmetal Workers' Int'l Ass'n, Loc. Union No. 137 v. Liberty Signs, Inc.*, No. 10-cv-1737 (ADS) (AKT), 2011 WL 4374519, at *6 (E.D.N.Y. Aug. 30, 2011), *report and recommendation adopted*, 2011 WL 4373893 (E.D.N.Y. Sept. 19, 2011).

A reasonable hourly rate is "'the rate a paying client would be willing to pay,' based on the 'prevailing [hourly rate] in the community . . . where the district court sits.'"  *E. Sav. Bank,*

30

*FSB v. Whyte*, No. 13-cv-6111 (CBA) (LB), 2015 WL 790036, at *8 (E.D.N.Y. Feb. 24, 2015) (quoting *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany,* 522 F.3d 182, 190 (2d Cir. 2007).  In assessing a reasonable hourly rate, the court takes into consideration the market rate "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation."  *See Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984).  The relevant "'community' for purposes of this calculation is the district where the district court sits."  *Arbor Hill*, 522 F.3d at 190.  "The party applying for fees must support the hourly rates it claims with, for example, evidence of counsel's expertise and prevailing market rates."  *Gesualdi v. Bestech Transp., LLC*, No. 14-CV-1110 (JS) (ARL), 2022 WL 866853, at *2 (E.D.N.Y. Mar. 23, 2022) (internal quotations omitted).

In support of their request for attorneys' fees and costs, Plaintiff's counsel has provided billing records with an itemized breakdown of hours and descriptions of each task conducted, (*see* DE 15-4).  *See New York Association for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1148 (2d Cir. 1983) (noting that fee applications should include "contemporaneous time records . . . [that] specify, for each attorney, the date, the hours expended, and the nature of the work done.").  Plaintiff's counsel also submitted a declaration attesting to the experience, and hourly rates, of the attorneys and legal staff that worked on this matter.  (*See* DE 15.)

Plaintiff seeks $12,467.50 for the 36.2 hours of work billed.  (DE 15-4 at 6.)  Plaintiff's counsel states that the 36.2 hours billed reflect reviewing the underlying facts of the case, reviewing the Agreement, engaging with Defendant to give it notice of its default and obtain compliance with terms of the Agreement, terminating the Agreement, drafting the complaint, obtaining entry of default, drafting the subject motion, and all the other staff work in support of the same.  (DE 15 at 5; DE 15-9 at 17.)  Upon review of these records, the Court finds the

31

number of hours expended to be reasonable and directly related to enforcement of Plaintiff's

rights under the Agreement.  *See Sagax Dev. Corp. v. ITrust S.A.*, No. 1:19-CV-3386 (RA) (JW),

2022 WL 2663488, at *1 (S.D.N.Y. July 11, 2022) ("A court-awarded attorneys' fee must

compensate only for 'hours reasonably expended on the litigation,' not for 'hours that are

excessive, redundant, or otherwise unnecessary.'" (quoting *Hensley v. Eckerhart*, 461 U.S. 424,

433-34 (1983)).

Per the declaration of David J. Mahoney, the universe of individuals that billed on the

matter include: (1) two partners at $650 per hour -- one with twenty years of experience and the

other with thirty-eight years of experience, admitted to the bar in 2002, and 1984 respectively;

(2) one partner at $475 per hour, admitted to the bar in 2007, and with fifteen years of

experience; (3) one associate at $325 per hour, admitted to the bar in 2017 and with five years of

experience; (4) a host of professional staff, including paralegals, each at $225 per hour and with

at least five years of experience in their respective roles; and (5) one third-year law student at

$250 per hour.   (*See* DE 15 at 4-5.)  All of these individuals are employed by the law firm

SilvermanAcampora LLP, which is located in Jericho, New York.

Plaintiff states that "[t]his motion differed somewhat from the ordinary default motion for

a simple breach of contract, in that the demonstrated need for an injunction under the Lanham

Act entailed substantial further and additional research and briefing."  (DE 15-9 at 7.)  The Court

agrees that this motion involved more than say a straightforward default motion for breach of

contract.  *See e.g.*, *Nat'l Env't Safety Co., Inc. v. Katz*, No. 18-cv-02161 (JMA) (GRB), 2019 WL

1994049, at *2 (E.D.N.Y. May 6, 2019) (awarding hourly rates from $500-600 per hour for

partners, $300 per hour for associates, and $100 per hour for paralegals related to a motion for

default judgment in a breach of contract matter).  Thus, the Court finds the rates sought for

partners and associates here, which are comparable to those awarded in *Katz* over three years ago, are appropriate.  *See id.*

      However, the rates submitted by Plaintiff's counsel for support staff and non-attorneys are beyond the reasonable rates charged in this district even when measured by, of the cases Plaintiff's counsel cites, those that are commensurate with the case at hand.  Those cases counsel that a $100 per hour rate is reasonable for paralegals and legal support staff.  *See Reiter v. Maxi-Aids, Inc.,* No. 14-cv-3712 (SJF) (GRB), 2019 WL 1641306, at *4 (E.D.N.Y. Apr. 16, 2019) (finding $100 per hour for paralegals to be reasonable); *Katz,* 2019 WL 1994049, at *2 (same).  That number is in line with the hourly rate considered reasonable in similar types of cases.  *See, e.g., Crye Precision LLC v. Bennettsville Printing*, No. 15-CV-221 (FB) (RER), 2019 WL 6388636, at *9 (E.D.N.Y. Aug. 13, 2019), *report and recommendation adopted*, 2019 WL 4463298 (E.D.N.Y. Sept. 18, 2019) (finding $100 an hour to be reasonable for legal support professionals with experience in a case involving claims of, *inter alia*, breach of contract and Lanham Act violations).  But given the date of those cases, the Court finds that, naturally, an adjustment of those rates is necessary to account for inflation and changing rates.[3]

      Accordingly, the undersigned respectfully recommends an award of attorneys' fees for the 36.2 hours billed as follows:

| **Attorneys** | **Rates** | **Hours** | **Amount** |
| --- | --- | --- | --- |
| Anthony C. Acompora | $650 | .60 | $390 |
| David J. Mahoney | $650 | 1.30 | $845 |
| Justin Krell | $475 | .70 | $332.50 |

---

[3] For example, an award of a $100 per hour for paralegals or professional support staff with legal experience, in August of 2019, would today after adjustment for inflation alone, according to the Bureau of Labor Statistics's Inflation Calculator, would be at least $116.  *See* CPI Inflation Calculator, http://data.bls.gov/cgi-bin/cpicalc.pl.

| | | | |
|---|---|---|---|
| William Bergesch | $325 | 25.1 | $8,157.5 |
| James M. Black[4] | $0 | 2.00 | $0 |
| Paralegals and Clerks | $125 | 6.5 | $812.50 |
| **Total:** | | | **$10,537.50** |

Therefore, the undersigned respectfully recommends an award of attorneys' fees[5] in the amount of $10,537.50.[6]

## CONCLUSION

Accordingly, the undersigned respectfully recommends that the Plaintiff's motion for default judgment be granted in part, and denied in part as to Plaintiff's request for default judgment, consistent with this Report and Recommendation.

## OBJECTIONS

A copy of this Report and Recommendation is being electronically served on counsel. Any written objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report. 28 U.S.C. § 636(b)(1) (2006 & Supp. V 2011); Fed. R. Civ. P. 6(a), 72(b). Any requests for an extension of time for filing objections must be directed to the district judge assigned to this action prior to the expiration of the fourteen

---

[4] The Court declines to award fees for James M. Black who appears on the billing records (DE 15-4) but is not even mentioned in the declaration (DE 15) as someone who billed on the matter, let alone described with the appropriate background information regarding their position and experience like the Court would need to assess the reasonableness of their fees. *See.e.g*, *Carco Grp., Inc. v. Maconachy*, No. 05-cv-6038 ARL, 2011 WL 6012426, at *9 (E.D.N.Y. Dec. 1, 2011), *rev'd in part and vacated in part on other grounds*, 718 F.3d 72 (2d Cir. 2013) (declining to award fees when no background information regarding credentials or position at the firm was provided for certain individuals).

[5] Plaintiff did not submit an application for costs nor sought costs as part of the relief outlined in the declaration submitted (*see* DE 15), and thus, the Court only addresses the attorneys' fees.

[6] To the extent any of the hourly rates reflected in the billing records are inconsistent with the rates stated on the declaration, the rates were conformed to the latter. (*See, e.g*, DE 15 at 4 (stating $325 as William Bergesch's hourly rate); *but see* DE 15-4 at 6 (reflecting a $325 and a $350 hourly rate for William Bergesch in different entries)).

(14) day period for filing objections.  Failure to file objections within fourteen (14) days will preclude further review of this Report and Recommendation either by the District Court or the Court of Appeals.  *Thomas v. Arn*, 474 U.S. 140, 145 (1985) ("a party shall file objections with the district court or else waive right to appeal"); *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008) ("failure to object timely to a magistrate's report operates as a waiver of any further judicial review of the magistrate's decision"); *see Monroe v. Hyundai of Manhattan & Westchester*, 372 F. App'x 147, 147–48 (2d Cir. 2010) (same).

Dated:          Central Islip, New York
                December 12, 2022


                                        RESPECTFULLY RECOMMENDED,

                                        /S/ *James M. Wicks*
                                            JAMES M. WICKS
                                        United States Magistrate Judge